**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

BENJAMIN NATHANSON, Derivatively On Behalf of CITIGROUP, INC.,

                Plaintiff,

  vs.

CHARLES PRINCE, ROBERT E. RUBIN, WINFRIED BISCHOFF, ROBERT DRUSKIN, WILLIAM R. RHODES, SALLIE L. KRAWCHECK, DAVID C. BUSHNELL, STEVEN J. FREIBERG, JOHN C. GERSPACH, MICHAEL S. HELFER, MICHAEL KLEIN, STEPHEN R. VOLK, LEWIS B. KADEN, GARY CRITTENDEN, RICHARD D. PARSONS, FRANKLIN A. THOMAS, KENNETH T. DERR, C. MICHAEL ARMSTRONG, JOHN M. DEUTCH, ALAIN J.P. BELDA, ROBERTO HERNANDEZ RAMIREZ, GEORGE DAVID, ANNE M. MULCAHY, JUDITH RODIN, ANDREW N. LIVERIS, ROBERT L. RYAN, THOMAS G. MAHERAS, ANN DIBBLE JORDAN, DUDLEY C. MECUM, KLAUS KLEINFELD,

               Defendants,

  -and-

CITIGROUP, INC., a Delaware corporation,

            Nominal Defendant.

-------------------------------------------------------------X

: Case No **07 CV 10333**
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
: DEMAND FOR JURY TRIAL



**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his attorneys submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Citigroup, Inc. ("Citigroup" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act"), that occurred between January 2007 and the present (the "Relevant Period") and that have caused substantial monetary losses to Citigroup and other damages, such as to its reputation and goodwill.

2.     Citigroup provides a wide range of financial services. During the Relevant Period, Citigroup, under defendants' direction, recklessly spent billions of dollars purchasing subprime loans to be warehoused for future collateralized debt obligations. These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers.

3.     Despite these material adverse circumstances, defendants directed Citigroup to issue a series of improper statements that proclaimed record growth. In fact, defendant Charles Prince ("Prince"), Citigroup's former Chief Executive Officer ("CEO"), stated in the *Financial Times* that there was too much liquidity for turmoil in the subprime mortgage market to "stop the music." In the meantime, according to Prince: "We're still dancing."

4.     Apparently, the "music stopped" on October 1, 2007 when Citigroup announced a $1.4 billion write-down of its leveraged loan commitments. On October 15, 2007, Citigroup announced third fiscal quarter earnings that were 60% lower than the Company's prior year results. But the worst was still to come.

5.     On November 4, 2007, Citigroup revealed an additional $8 to $11 billion write-down of its subprime secured assets. Further, Citigroup revealed in a Securities and Exchange Commission ("SEC") filing that it was downward revising its earlier reported third quarter results by $166 million. Understandably, defendant Prince resigned in the face of these disclosures.

-1-

6.      While defendants were directing Citigroup to issue improper statements concerning its exposure to the subprime market crisis, they were also directing Citigroup to repurchase over $663 million worth of its own shares at artificially inflated prices. Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $36 million in proceeds.

7.      Currently, Citigroup's credibility with investors is in shambles. During the Relevant Period, the Company's value has declined from over $55 per share to less than $36 per share—an $83.3 billion market capitalization loss.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Citigroup maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful

acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Citigroup occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.    Plaintiff Benjamin Nathanson is and was, at times relevant hereto, an owner and holder of Citigroup common stock. Plaintiff is a citizen of Michigan.

12.    Nominal defendant Citigroup is a Delaware corporation with its principal executive offices located at 399 Park Avenue, New York, New York. Citigroup is a multibank holding company that provides various financial services to customers in the United States and internationally.

13.    Defendant Prince was Citigroup's CEO and a director from 2003 to November 2007. Prince was also Citigroup's Chairman of the Board from 2006 to November 2007. Prince was Citigroup's Chairman and CEO, Global Corporate and Investment Bank from 2002 to 2003; Chief Operating Officer ("COO") from 2001 to 2002; Chief Administrative Officer from 2000 to 2001; and General Counsel and Corporate Secretary from 1983 to 2000. Prince was a member of Citigroup's Executive Committee from 2004 to November 2007. Because of his positions, defendant Prince knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Prince participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Prince received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $1,000,000 | $13,200,000 | $10,633,333 | $746,607 | - | $137,441 | $258,338 |

| 2005 | $1,000,000 | $12,000,000 | $9,666,667 | - | - | - | $328,062 |
| 2004 | $983,333 | $9,690,000 | $7,805,833 | - | 226,155 | - | $123,290 |
| 2003 | $638,636 | $6,965,375 | $19,207,706 | - | 436,042 | - | $431 |

Defendant Prince sold 146,243 shares of Citigroup stock for $7,895,074.25 in proceeds while in possession of material non-public information. Defendant Prince is a citizen of New York.

14.    Defendant Robert E. Rubin ("Rubin") has been Chairman of Citigroup's Executive Committee since 1999 and has been a director since October 1999. Rubin was also a member of Citigroup's Office of the Chairman from October 1999 to at least January 2007. On November 4, 2007, Rubin was appointed Chairman of the Board. Because of his positions, defendant Rubin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Rubin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Rubin received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 2006 | $1,000,000 | $8,400,000 | $6,766,666 | $828,342 | - | $20,916 | $325,380 |
| 2005 | $1,000,000 | $8,400,000 | $6,766,667 | - | 161,389 | - | $330,392 |
| 2004 | $1,000,000 | $8,400,000 | $6,766,667 | - | - | - | $461,439 |
| 2003 | $1,000,000 | $10,250,000 | $5,000,000 | - | 100,000 | - | $306,813 |

Defendant Rubin sold 77,500 shares of Citigroup stock for $4,266,375 in proceeds while in possession of material non-public information. Defendant Rubin is a citizen of New York.

15.    Defendant Winfried Bischoff ("Bischoff") is Citigroup's Acting CEO and has been since November 2007. Bischoff is also Chairman of Citi Europe and a member of the Citi Business Heads, Management and Operating Committees and has been since May 2000. Because of his positions, defendant Bischoff knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Bischoff participated in the issuance of improper statements,

including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Bischoff sold 33,127 shares of Citigroup stock for $1,793,046.56 in proceeds while in possession of material non-public information. Defendant Bischoff is a citizen of the United Kingdom.

16.     Defendant Robert Druskin ("Druskin") is Citigroup's COO and Corporate and Investment Banking Chairman and has been since January 2007. Druskin is also the Citigroup Corporate and Investment Banking President and has been since August 2002 and the Citigroup Corporate and Investment Banking CEO and has been since December 2003. Druskin was Citigroup's Chief Operations and Technology Officer from September 2000 to August 2002 and the Citigroup Corporate and Investment Banking COO from August 2002 to December 2003. Because of his positions, defendant Druskin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Druskin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Druskin received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $500,000 | $8,100,000 | $6,555,103 | $467,680 | - | $42,352 | $43,911 |
| 2005 | $500,000 | $6,600,000 | $5,316,667 | - | 16,863 | - | $143,999 |
| 2004 | $500,000 | $4,860,000 | $3,915,000 | - | 179,545 | - | $774 |
| 2003 | $300,000 | $4,237,500 | $2,430,750 | - | 195,067 | - | $774 |

Defendant Druskin sold 97,524 shares of Citigroup stock for $5,253,690.85 in proceeds while in possession of material non-public information. Defendant Druskin is a citizen of New Jersey.

17.     Defendant William R. Rhodes ("Rhodes") is Citigroup's Senior Vice Chairman and has been since at least March 2002. Rhodes is also Citibank, N.A.'s Chairman and has been since at least March 2003 and Citicorp Holdings' Chairman and has been since at least March 2003. Rhodes

is Citibank, N.A.'s Chairman, President and CEO. Rhodes is also Citibank Holdings', President and CEO. Rhodes was Citigroup's Vice Chairman from at least March 2000 to at least March 2002. Because of his positions, defendant Rhodes knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Rhodes participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Rhodes sold 80,614 shares of Citigroup stock for $4,319,376.82 in proceeds while in possession of material non-public information. Defendant Rhodes is a citizen of New York.

18.     Defendant Sallie L. Krawcheck ("Krawcheck") is Citigroup's Chairman and CEO of Global Wealth Management and has been since March 2007. Krawcheck was also Citigroup's Head of Strategy and Chief Financial Officer ("CFO") from November 2004 to March 2007 and Chairman and CEO of Smith Barney from October 2002 to November 2004. Because of her positions, defendant Krawcheck knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Krawcheck participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Krawcheck received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $500,000 | $5,820,000 | $2,946,251 | $645,701 | - | $6,315 | - |
| 2005 | $500,000 | $5,280,000 | $4,253,333 | - | - | - | $37,742 |
| 2004 | $500,000 | $4,320,000 | $3,480,000 | - | 66,667 | - | $180 |
| 2003 | $500,000 | $5,875,000 | $2,833,333 | - | 166,667 | - | $162 |

Defendant Krawcheck sold 50,339 shares of Citigroup stock for $2,745,992.45 in proceeds while in possession of material non-public information. Defendant Krawcheck is a citizen of New York.

19.    Defendant David C. Bushnell ("Bushnell") is Citigroup's Senior Risk Officer and has been since December 2003.  Bushnell is also Citigroup's Chief Administrative Officer.  Because of his positions, defendant Bushnell knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup.  During the Relevant Period, Bushnell participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.  Defendant Bushnell sold 50,861 shares of Citigroup stock for $2,700,042.09 in proceeds while in possession of material non-public information.  Defendant Bushnell is a citizen of New Jersey.

20.    Defendant Steven J. Freiberg ("Freiberg") is Citigroup's Co-Chairman and Co-CEO, Global Consumer Group—North America and has been since 2005.  Freiberg was also Citi Cards' Chairman and CEO from 2000 to at least August 2005.  From 1997 to 2000, Freiberg assumed responsibility for several major Strategic Business Groups in Citigroup's Credit Card Division. From 1980 to 1997, Freiberg served in a variety of senior management positions.  Because of his positions, defendant Freiberg knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Freiberg participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.  Defendant Freiberg sold 32,753 shares of Citigroup stock for $1,747,034.93 in proceeds while in possession of material non-public information.  Defendant Freiberg is a citizen of New York.

21.    Defendant John C. Gerspach ("Gerspach") is Citigroup's Controller and Chief Accounting Officer and has been since March 2005.  Gerspach was also CFO of Citigroup Latin America from July 2003 to March 2005; Chief Administrative Officer of Citigroup Latin America from April 2002 to March 2005; and Chief Administrative Officer of Citigroup e-Business from February 2000 to April 2002.  Because of his positions, defendant Gerspach knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse

-7-

non-public information about the business of Citigroup. During the Relevant Period, Gerspach participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Gerspach sold 23,702 shares of Citigroup stock for $1,261,956.74 in proceeds while in possession of material non-public information. Defendant Gerspach is a citizen of New York.

22.     Defendant Michael S. Helfer ("Helfer") is Citigroup's General Counsel and Corporate Secretary and has been since February 2003. Because of his positions, defendant Helfer knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Helfer participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Helfer sold 19,590 shares of Citigroup stock for $1,068,634.50 in proceeds while in possession of material non-public information. Defendant Helfer is a citizen of New York.

23.     Defendant Michael Klein ("Klein") is Citigroup's Chairman and Co-CEO, Citi Markets & Banking and has been since May 2007. Klein is also Citigroup's Vice Chairman, Citibank International. Klein was Citigroup's Co-President, Corporate and Investment Banking from January 2007 to at least March 2007; CEO, Global Banking from February 2004 to at least May 2006; CEO, Global Corporate and Investment Banking for Europe, the Middle East, and Africa from March 2003 to February 2004; CEO, Global Corporate and Investment Banking for Western Europe from 2002 to March 2003; Global Co-Head of the Investment Bank from 1999 to March 2003; and a Managing Director from 1993 to 1999. Because of his positions, defendant Klein knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Klein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and

Citigroup shareholders. Defendant Klein sold 19,282 shares for $1,006,327.58 in proceeds while in possession of material non-public information. Defendant Klein is a citizen of New Jersey.

24.    Defendant Stephen R. Volk ("Volk") is Citigroup's Vice Chairman and has been since July 2004. Because of his position, defendant Volk knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Volk participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Volk received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $200,000 | $5,670,000 | $3,915,520 | $10,928 | $29,488 |

Defendant Volk sold 16,347 shares of Citigroup stock for $891,728.85 in proceeds while in possession of material non-public information. Defendant Volk is a citizen of New York.

25.    Defendant Lewis B. Kaden ("Kaden") is Citigroup's Vice Chairman and Chief Administrative Officer and has been since September 2005. Because of his positions, defendant Kaden knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Kaden participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Kaden sold 11,200 shares of Citigroup stock for $610,960 in proceeds while in possession of material non-public information. Defendant Kaden is a citizen of New York.

26.    Defendant Gary Crittenden ("Crittenden") is Citigroup's CFO and has been since March 2007. Because of his position, defendant Crittenden knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public

information about the business of Citigroup. During the Relevant Period, Crittenden participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Crittenden is a citizen of Connecticut.

27.    Defendant Richard D. Parsons ("Parsons") is a Citigroup director and has been since 1996. Parsons was also a Citibank, N.A. director from 1996 to 1998. Parsons is a member of Citigroup's Executive Committee and has been since 2007; a member of the Personnel and Compensation Committee and has been since October 1998; and Chairman of the Personnel and Compensation Committee and has been since 2003. Because of his positions, defendant Parsons knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Parsons participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Parsons is a citizen of New York.

28.    Defendant Franklin A. Thomas ("Thomas") is a Citigroup director and has been since 1970. Thomas was also a Citibank, N.A. director from 1970 to 1998. Thomas was a member of Citigroup's Executive Committee from October 1998 to 2007 and a member of the Personnel and Compensation Committee from October 1998 to 2003. Because of his positions, defendant Thomas knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Thomas participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Thomas is a citizen of New York.

29.    Defendant Kenneth T. Derr ("Derr") is a Citigroup director and has been since 1987. Derr is also a member of Citigroup's Personnel and Compensation Committee and has been since 2004. Derr was a member of Citigroup's Audit and Risk Management Committee from October 1998 to 2004 and a member of the Executive Committee from October 1998 to 2007. Because of his

positions, defendant Derr knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Derr participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Derr is a citizen of California.

30.     Defendant C. Michael Armstrong ("Armstrong") is a Citigroup director and has been since 1989. Armstrong is also Chairman of Citigroup's Audit and Risk Management Committee and has been since 2004; a member of the Audit and Risk Management Committee and has been since 1995; and a member of the Executive Committee and has been since 2006. Because of his positions, defendant Armstrong knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Armstrong participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Armstrong is a citizen of Connecticut.

31.     Defendant John M. Deutch ("Deutch") is a Citigroup director and has been since 1996. Deutch was also a Citigroup director from 1987 to 1993 and a Citibank, N.A. director from 1987 to 1993 and from 1996 to 1998. Deutch is a member of Citigroup's Audit and Risk Management Committee and has been since October 1998. Because of his positions, defendant Deutch knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Deutch participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Deutch is a citizen of Massachusetts.

32.     Defendant Alain J.P. Belda ("Belda") is a Citigroup director and has been since 1997. Belda is also a member of Citigroup's Executive Committee and has been since 2005 and a member

of the Personnel and Compensation Committee and has been since 2004. Belda was a member of Citigroup's Audit and Risk Management Committee from October 1998 to 2005. Because of his positions, defendant Belda knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Belda participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Belda is a citizen of New York.

33.    Defendant Roberto Hernandez Ramirez ("Ramirez") is a Citigroup director and has been since 2001. Because of his position, defendant Ramirez knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Ramirez participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Ramirez is a citizen of Mexico.

34.    Defendant George David ("David") is a Citigroup director and has been since 2002. David is also a member of Citigroup's Audit and Risk Management Committee and has been since 2003. Because of his positions, defendant David knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, David participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant David is a citizen of New Jersey.

35.    Defendant Anne M. Mulcahy ("Mulcahy") is a Citigroup director and has been since 2004. Mulcahy is also a member of Citigroup's Audit and Risk Management Committee and has been since 2007. Because of her positions, defendant Mulcahy knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Mulcahy participated in

-12-

the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Mulcahy is a citizen of Connecticut.

36.   Defendant Judith Rodin ("Rodin") is a Citigroup director and has been since 2004. Rodin is also a member of Citigroup's Audit and Risk Management Committee and has been since 2005 and a member of the Executive Committee and has been since 2007. Because of her positions, defendant Rodin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Rodin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Rodin is a citizen of Pennsylvania.

37.   Defendant Andrew N. Liveris ("Liveris") is a Citigroup director and has been since 2005. Liveris is also a member of Citigroup's Audit and Risk Management Committee and has been since 2006. Because of his positions, defendant Liveris knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Liveris participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Liveris is a citizen of Michigan.

38.   Defendant Robert L. Ryan ("Ryan") is a Citigroup director and has been since July 2007. Ryan is also a member of Citigroup's Audit and Risk Management Committee and has been since 2007. Because of his positions, defendant Ryan knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Ryan participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and

approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Ryan is a citizen of Minnesota.

39.    Defendant Thomas G. Maheras ("Maheras") was Citigroup's Chairman and Co-CEO of Citi Markets & Banking from May 2007 to October 2007. Maheras was also Citigroup's Co-President of Citi Markets & Banking in 2007 and CEO of Global Capital Markets from 2004 to 2007. From 1984 to 2004, Maheras held various positions with Salomon Smith Barney (acquired by Citigroup) and Citigroup. Because of his positions, defendant Maheras knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Maheras participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Maheras sold 23,964 shares of Citigroup stock for $1,266,257.76 in proceeds while in possession of material non-public information. Defendant Maheras is a citizen of New York.

40.    Defendant Ann Dibble Jordan ("Jordan") was a Citigroup director from 1989 to April 2007. Jordan was also a member of Citigroup's Personnel and Compensation Committee from 1994 to 2003 and from 2006 to 2007. Because of her positions, defendant Jordan knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Jordan participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Jordan is a citizen of the District of Columbia.

41.    Defendant Dudley C. Mecum ("Mecum") was a Citigroup director from 1986 to April 2007. Mecum was also Chairman of Citigroup's Audit and Risk Management Committee from 1994 to 2003 and a member of the Executive Committee from October 1998 to 2007. Because of his positions, defendant Mecum knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of

-14-

Citigroup. During the Relevant Period, Mecum participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Mecum is a citizen of Connecticut.

42.      Defendant Klaus Kleinfeld ("Kleinfeld") was a Citigroup director from 2005 to August 2007. Because of his position, defendant Kleinfeld knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During the Relevant Period, Kleinfeld participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Kleinfeld is a citizen of New York.

43.      The defendants identified in ¶¶13-14, 24-25, 27-38, 40-42 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-26, 39 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-25, 39 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

44.      By reason of their positions as officers, directors and/or fiduciaries of Citigroup and because of their ability to control the business and corporate affairs of Citigroup, the Individual Defendants owed Citigroup and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Citigroup in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Citigroup and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

45.      Each director and officer of the Company owes to Citigroup and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of

fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Citigroup, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Citigroup, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Citigroup.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Citigroup, and was at all times acting within the course and scope of such agency.

48.     To discharge their duties, the officers and directors of Citigroup were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Citigroup were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the

-16-

Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how Citigroup conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

49.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Citigroup, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Citigroup's Board during the Relevant Period.

50.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at Citigroup and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) sell over $36 million of their personally held shares; and (iv) deceive the investing public, including shareholders of Citigroup, regarding the Individual Defendants' management of Citigroup's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

53.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Citigroup was misrepresenting its business prospects.

54.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of federal securities law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

55.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the

Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

56.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND: THE SUBPRIME MARKET CRISIS

57.     Citigroup provides a wide range of financial services. Some of those services include the management of collateralized debt obligations ("CDOs"). A CDO consists of a portfolio of credit-risky fixed-income assets such as asset-backed securities including securitized mortgages. An investment bank, such as Citigroup, creates a CDO by acquiring an inventory of asset-backed securities and then selling rights to the cash flow from the securities in a number of tranches rated by credit risk. Citigroup then profits from the fees that it charges to manage the CDO.

58.     During times relevant hereto, the Individual Defendants directed Citigroup to acquire a vast inventory of securities backed by mortgages made to subprime borrowers. A subprime borrower is someone with a low credit score, higher debt-to-income ratio, or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.

59.     In an environment of appreciating home prices and low interest rates, subprime lenders are typically able to stay current due to the rising equity in their property. But in an environment of depreciating home prices, increasing default rates are the norm. This is exactly what has been occurring since late 2006.

60.     Thus, a subprime mortgage crisis erupted beginning in January 2007. During the first stage of this crisis, several prominent subprime lenders including New Century Financial Corporation declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company ("Accredited"), staged fire sales in a desperate attempt to raise cash to stay afloat.

61.     During March 2007, the Individual Defendants recklessly directed Citigroup to purchase over *$2.7 billion* in subprime loans from Accredited at one of those fire sales.

## IMPROPER STATEMENTS

62.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to Citigroup a duty to insure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

63.     This material, non-public information principally included Citigroup's exposure to the subprime lending market crisis. Furthermore, defendants Armstrong, David, Deutch, Liveris, Mulcahy, Rodin and Ryan, as members of the Audit and Risk Management Committee, had a special duty to know and understand this material information as set out in the Audit and Risk Management Committee's charter which provides that that the committee is responsible for reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.

64.     Defendants Prince, Rubin, Bischoff, Druskin, Rhodes, Krawcheck, Bushnell, Freiberg, Gerspach, Helfer, Klein, Volk, Kaden, Crittenden and Maharas had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Prince, Rubin, Parsons, Thomas, Derr, Armstrong, Deutch, Belda, Ramirez, David, Mulcahy, Rodin, Liveris, Ryan, Jordan, Mecum and Kleinfeld as directors of Citigroup had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Citigroup to the investing public and the Company's shareholders during the Relevant Period.

65.     On January 19, 2007, the Individual Defendants caused or allowed Citigroup to issue

a press release announcing its earnings for fourth fiscal quarter 2006. The press release highlighted

double-digit revenue growth and positive trends in Citigroup's strategic actions. The press release

stated in relevant part:

> Citigroup Inc. today reported net income for the 2006 fourth quarter of $5.13 billion,
> or $1.03 per share. Results include previously disclosed charges of $415 million
> after-tax in Japan consumer finance to increase reserves and reposition the business.
> Return on common equity was 17.2%.
>
> For the full year 2006, net income was $21.54 billion, or $4.31 per share, and
> return on common equity was 18.8%. See Appendix A for full year business segment
> results.
>
> Management Comment
>
> "Our results were highlighted by ***double-digit revenue growth*** in our
> corporate and investment banking, wealth management and alternative investment
> businesses. In U.S. consumer, we continued to see ***positive trends*** from our strategic
> actions. Performance in these businesses was partially offset by lower results in
> international consumer, which included significant charges in our Japan consumer
> finance business. Customer balances continued to grow strongly, partly driven by our
> investment in new distribution," said Charles Prince, Chairman and Chief Executive
> Officer of Citigroup.
>
> "During the quarter, we continued to expand our business through a balance
> of organic investment and targeted acquisitions. We opened a record number of
> branches and continued to invest in our technology and our people. We also
> announced five acquisitions, all to expand our international franchise. We led a
> consortium that acquired 85% of Guangdong Development Bank in China. In Central
> America, we announced the acquisition of Grupo Financiero Uno, a consumer credit
> card franchise, and Grupo Cuscatlan, a corporate and consumer bank. We also
> announced the acquisition of Quilter, one of the United Kingdom's most respected
> wealth advisory firms, and the acquisition of a 20% stake in Akbank, a leading
> Turkish bank," said Prince.
>
> "Our 2007 priorities are clear: generating sustainable growth in U.S.
> consumer, growing international consumer, corporate and investment banking and
> wealth management businesses more quickly, focusing sharply on expense
> management, and remaining highly disciplined in credit management. We will
> continue to invest to integrate our businesses and expand our reach, while at the same
> time taking a thorough review of our entire expense base to ensure that we operate as
> efficiently and effectively as possible," said Prince.
>
> \* \* \*
>
> Fourth Quarter Summary
>
> * Revenues were *a record*, up 15%, driven by 14% revenue growth in
>     corporate and investment banking, 79% in alternative investments

and 21% in global wealth management. Global consumer revenues increased 9%.

    o   International revenues grew 11%, with international corporate and investment banking up 20% and international wealth management up 48%. International consumer revenues increased 2%, including the impact of charges in Japan consumer finance.

    o   Deposits and loans grew 20% and 16%, respectively. In global consumer, investment AUMs increased 17%. Capital markets and banking ranked #1 in global debt underwriting, #2 in announced M&A and #2 in global equity underwriting and global loan syndications for the full year 2006. In global wealth management, client assets under fee-based management grew 15%.

- Operating expenses increased 23%, including 4 percentage points due to increased investment spending, 3 percentage points due to acquisitions and foreign exchange, and 2 percentage points due to SFAS 123(R) accruals. The remaining expense growth was driven by higher business volumes, and the absence of a net release of legal reserves that lowered expenses in the prior-year period.

    o   The company opened a record 380 new branches, including 288 internationally and 92 in the U.S. For the full year 2006, a record 1,165 branches have been opened, of which 862 are international and 303 are in the U.S.

- Credit costs increased 10%, as lower costs in U.S. consumer were more than offset by increased credit costs in international consumer and corporate and investment banking. U.S. consumer credit costs declined due to lower bankruptcy filings. In international consumer, credit costs primarily reflected portfolio growth, including a significant increase in Mexico due to target market expansion. The international and U.S. consumer credit environment was generally stable. The global corporate credit environment also remained stable.

- Excluding charges in Japan consumer finance, the net interest margin was even with the 2006 third quarter.

- Share repurchases totaled $1 billion, or approximately 19 million shares. For the full year 2006, share repurchases totaled $7 billion and dividends paid to common shareholders totaled $9.8 billion.

\* \* \*

CORPORATE AND INVESTMENT BANKING

\* \* \*

- ***Capital Markets and Banking***

     o     Fixed income markets revenues *increased 32%* to $2.75 billion, primarily driven by *improved results in interest rate and credit products* and foreign exchange.

66.     On April 16, 2007, the Individual Defendants caused or allowed Citigroup to issue a

press release announcing the Company's earnings for the first fiscal quarter 2007. The press release

announced record revenues driven by 23% revenue growth in Citigroup's Markets & Banking

business segment. The press release stated in relevant part:

Citigroup Inc. today reported net income for the 2007 first quarter of $5.01 billion, or $1.01 per share. Results include a previously disclosed charge of $1.38 billion, or $871 million after-tax, related to a structural expense review conducted during the quarter. Excluding the charge, net income was $5.88 billion, or $1.18 per share. Return on common equity was 17.1%.

### Management Comment

"We generated *strong momentum* this quarter, with revenues increasing 15% to a record, driven by growing customer business volumes. Global consumer deposits were up 12% and global consumer loans grew 11%. In our international franchises, revenues grew 18%, led by international markets & banking revenue up 20%. Our revenue growth combined with improving expense management and, after adjusting for certain non-recurring items, we generated positive operating leverage. Offsetting our improved revenue and expense performance were higher credit costs and a lower level of tax benefits than last year," said Charles Prince, Chairman and Chief Executive Officer of Citi.

"We continued to invest in expanding our distribution and enhancing our technology as we build a broad, strong foundation for future growth. We also announced the acquisition of Egg, Ltd. in the U.K., the world's largest internet bank, and we launched a tender offer to acquire 100% of Nikko Cordial in Japan, consistent with our effort to drive growth through a balance of organic investment and targeted acquisitions and expand internationally," said Prince.

"We achieved these results while completing our structural expense review, which will help us become a leaner, more efficient organization and lower our rate of expense growth. As we look ahead, our priorities are clear: we will invest to grow and integrate our businesses, take actions to improve efficiency and lower costs, and continue to build momentum across our franchises," said Prince.

### FIRST QUARTER SUMMARY

- Revenues were *a record*, up 15%, driven by *23% revenue growth in markets & banking*, including record revenues in fixed income and equity markets, investment banking and transaction services. International consumer revenues grew 14% and global wealth management revenues were a record, up 13%. U.S. consumer revenue growth continued to trend positively, up 6%.

  - o     Revenue growth reflected customer volume growth. Deposits and loans grew 18% and 15%, respectively. In global consumer, AUMs increased 12%. Securities and banking

ranked #1 in global debt and equity underwriting and #2 in completed M&A for the first quarter. In global wealth management, client assets under fee-based management grew 13% and client capital in alternative investments grew 52%.

o Net interest revenues grew 8% as volume growth was partially offset by net interest margin compression.

o Excluding the impact of gray zone in Japan consumer finance, the net interest margin declined 14 basis points versus the fourth quarter 2006, with slightly less than half of the decline in trading portfolios.

- Operating expenses increased 17%, including a $1.38 billion charge related to a structural expense review completed in the quarter. Excluding the charge, compensation accruals related to the revenue impact of adopting SFAS 157, and $648 million pre-tax in SFAS 123(R) accruals recorded in the prior-year period, expenses grew 10%, driven by increased business volumes and investment spending.

o The company opened 99 new branches during the quarter, including 48 internationally and 51 in the U.S.

- Credit costs increased $1.26 billion, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to increase loan loss reserves. The $597 million net charge compares to a net reserve release of $154 million in the prior-year period.

o In U.S. consumer, higher credit costs reflected an increase in net credit losses of $164 million and a net charge of $182 million to increase loan loss reserves. The $182 million net charge compares to a net reserve release of $196 million in the prior-year period. Credit costs increased primarily in U.S. consumer lending and U.S. retail distribution, reflecting portfolio growth, an increase in delinquencies in second mortgages, and a change in estimate of loan losses inherent in the portfolio.

o In international consumer, higher credit reflected an increase in net credit losses of $331 million and a net charge to increase loan loss reserves of $112 million. Higher credit costs primarily reflected portfolio growth, including target market expansion in Mexico cards and the integration of Credicard in Brazil, increased net credit losses in Japan consumer finance, and a change in estimate of loan losses inherent in the portfolio. The international consumer credit environment was generally stable.

o Markets & banking credit costs increased primarily due to a net charge of $286 million to increase loan loss reserves due to portfolio growth, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The $286 million net charge compares to a $33 million net charge to increase reserves in the prior-year period. The global corporate credit environment remained stable.

- Taxes. The effective tax rate on continuing operations was 26.9% versus 21.5% in the prior year period. The current period tax rate includes the impact of a charge related to the structural expense review and certain APB 23 benefits described below. The 2006 first quarter tax rate included a $598 million tax benefit on continuing operations, or $657 million in total, due to resolution of a federal audit.

- Share repurchases totaled $645 million, or approximately 12.1 million shares.

\* \* \*

## MARKETS & BANKING

- **Securities and Banking**

   o   *Fixed income markets revenues increased 20% to a record $3.8 billion*, driven by improved results across all products, including interest rates and currencies, and credit and securitized products.

67.    On July 10, 2007, the *Financial Times* published an article quoting defendant Prince's views on the turmoil in the subprime mortgage market and its implications for the leveraged finance market. The article quoted Prince as blithely commenting: "When the music stops, in terms of liquidity, things will be complicated. But as long as the music is playing, you've got to get up and dance. *We're still dancing*." Prince commented further that there was so much liquidity at the moment that the "party" would not be disrupted by turmoil in the subprime mortgage market.

68.    On July 20, 2007, the Individual Defendants caused or allowed Citigroup to issue a press release announcing the Company's earnings for the second fiscal quarter 2007. The press release announced another quarter of record revenues. As to Citigroup's Securities and Banking segment, the press release reported decreasing credit costs "reflecting a stable global corporate credit environment." The press release stated in relevant part:

Citigroup Inc. today reported net income for the 2007 second quarter of $6.23 billion, or $1.24 per share, both up 18%. International revenues and net income were a record, up 34% and 35%, respectively. Return on equity was 20.1%.

**Management Comment**

"We have very clear priorities to drive growth and we are executing on all of them. We generated *record revenues*, up 20%, and record earnings from continuing operations, up 18%, both driven by our record international results," said Charles Prince, Citi Chairman and Chief Executive Officer.

"We *continued to generate revenue and volume growth* in our U.S. consumer franchise, while making excellent progress in re-weighting Citi toward our other businesses, especially our international franchises, where revenues and net income increased over 30%. Our capital markets-driven businesses performed extremely well and international consumer revenues and volumes grew at a double-digit pace," said Prince.

"We also began to implement the structural expense initiatives announced in April, which are generating improved efficiencies. These initiatives, coupled with strong revenue growth, drove positive operating leverage this quarter and helped offset increased credit costs."

"We made excellent progress in expanding our business through targeted acquisitions, completing three international transactions, including an increase in our ownership of Nikko Cordial Corporation in Japan to 68%," said Prince.

### SECOND QUARTER SUMMARY

- **Revenues** were a record, up 20%, led by 34% growth in international revenues. International markets & banking revenues grew 50%, international consumer revenues increased 16%, and wealth management revenues more than doubled.

  o Revenue growth reflected double-digit customer volume growth. Deposits and loans grew 20% and 17%, respectively. Securities and banking ranked #1 in global debt underwriting, #2 in announced M&A, #3 in global equity underwriting, and achieved record revenues in equity markets and transaction services. In global wealth management, client assets under fee-based management grew 40%, and client capital in alternative investments increased 55%.

  o Strong volume growth drove a 16% increase in net interest revenues.

  o Excluding the impact of acquisitions, organic revenue growth was 16%.

  o The net interest margin declined 6 basis points versus the first quarter 2007, as the benefit from lower cost of funds was offset by growth in lower yielding trading assets.

- **Operating expenses** increased 16%, driven by increased business volumes and acquisitions, which were partially offset by savings from structural expense initiatives announced in April 2007, and the release of $300 million of litigation reserves reflecting our continued progress in favorably resolving WorldCom/Research matters.(1).

  o The company opened or acquired 160 new retail bank or consumer finance branches during the quarter, including 136 internationally and 24 in the U.S. Over the last twelve months, 1,001 retail bank and consumer finance branches have been opened or acquired.

    o    Excluding the impact of acquisitions, organic expense growth was 12%.

- **Credit costs** increased $934 million, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period.

      o    In U.S. consumer, higher credit costs reflected an increase in net credit losses of $183 million and a net charge of $245 million to increase loan loss reserves. The $245 million net charge compares to a net reserve release of $274 million in the prior-year period. The increase in net credit losses and loan loss reserves primarily reflected higher delinquencies in second mortgages in consumer lending, a change in estimate of loan losses inherent in the cards portfolio, and portfolio growth.

      o    In international consumer, higher credit costs reflected an increase in net credit losses of $155 million and a net charge to increase loan loss reserves of $236 million. The $236 million net charge compares to a net reserve release of $62 million in the prior-year period. The increase in net credit losses and loan loss reserves primarily reflected portfolio growth, an increase in past due accounts and portfolio seasoning in Mexico cards, higher net credit losses in Japan consumer finance, and the impact of recent acquisitions.

      o    Markets & banking credit costs declined, reflecting a stable global credit environment and the absence of a $118 million net increase to loan loss reserves recorded in the prior-year period.

- **Taxes**. The effective tax rate on continuing operations was 29.9% versus 30.3% in the prior-year period. The current period tax rate includes the impact of certain APB 23 benefits of $96 million described below.

\* \* \*

### MARKETS & BANKING

- **Securities and Banking**

      o    ***Fixed income markets revenues increased 24%*** to $3.42 billion, driven by improved results across all products, including interest rates and currencies, credit and securitized products, and commodities.

### THE TRUTH IS PARTIALLY REVEALED

69.    On October 1, 2007, the Individual Defendants caused or allowed Citigroup to issue a press release announcing that the Company was expecting a substantial decline in its third quarter net

income due to "write-downs in leveraged loan commitments," among other things. This write-down totaled *approximately $1.4 billion*. This press release, however, did not disclose Citigroup's full exposure to the subprime market crisis. The press release provided in relevant part:

> Citigroup Inc. announced today that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment are expected to have an adverse impact on third quarter financial results. Citi currently estimates that it will report *a decline in net income in the range of 60% from the prior-year quarter*, subject to finalizing third quarter results.
>
> "Our expected third quarter results are a clear disappointment. The decline in income was driven primarily by *weak performance in fixed income credit market activities*, write-downs in leveraged loan commitments, and increases in consumer credit costs," said Charles Prince, Chairman and CEO of Citi.
>
> "Our fixed income trading business has a long history of earnings power and success, as shown in this year's record first half results. In September, this business performed at more normalized levels and we see this quarter's overall poor trading performance as an aberration. While we cannot predict market conditions or other unforeseeable events that may affect our businesses, we expect to return to a normal earnings environment in the fourth quarter," said Prince.
>
> The following accounts for a significant portion of the expected decline in third quarter results:
>
> **Securities and Banking**
>
> Revenue reductions from:
>
> - *Write-downs of approximately $1.4 billion* pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments. These commitments totaled $69 billion at the end of the second quarter, and $57 billion at the end of the third quarter. Write-downs were recorded on all highly leveraged finance commitments where there was value impairment, regardless of the expected funding date.
>
> - *Losses of approximately $1.3 billion* pre-tax, net of hedges, on the *value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation* ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.
>
> - Losses of approximately $600 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.
>
> These revenue reductions were partially offset by lower expenses in Securities and Banking.
>
> **Global Consumer**

- An increase in credit costs of approximately $2.6 billion pre-tax versus the prior-year quarter due to continued deterioration in the credit environment, organic portfolio growth, and acquisitions. Approximately one-fourth of the increase in credit costs was due to higher net credit losses and approximately three-fourths was due to higher charges to increase loan loss reserves.

"Despite unusually poor results in certain businesses this quarter, Citi continues to execute its growth strategy and generate momentum across many of its franchises. Citi's international franchise continues to expand rapidly. Globally, revenues in equity underwriting, advisory, and transaction services are growing at a healthy double-digit pace, and customer volumes in the consumer business continue to show good growth. In Wealth Management, Citi's ability to serve client needs through the market dislocations is generating solid results. The structural expense initiatives announced in early April 2007 are on track and delivering the cost savings projected," said Prince.

Citi's estimated third quarter results include approximately $470 million of after-tax gain on the sale of Redecard shares.

70.    On October 15, 2007, the Individual Defendants caused or allowed Citigroup to issue a press release announcing the forecasted disappointing financial results for its third fiscal quarter 2007. The press release stated net income of $2.38 billion, a decline of 57% from the Company's prior year results. The press release stated in relevant part:

Citigroup Inc. today reported net income for the 2007 third quarter of $2.38 billion, or $0.47 per share, a decline of 57% from the prior-year quarter. Results include a $7.4 million pre-tax gain on the sale of Redecard shares. Return on equity was 9%. On October 1, 2007, Citi announced that it expected third quarter 2007 net income to decline in the range of 60%, subject to finalizing third quarter results.

**Management Comment**

"This was a disappointing quarter, even in the context of the dislocations in the sub-prime mortgage and credit markets. A significant amount of our income decline was in our fixed income business, where we have a long track record of strong earnings, and this quarter's performance was well below our expectations. Although we generated strong momentum in many of our franchises, our fixed income results, along with higher credit costs in global consumer, led to significantly lower net income," said Charles Prince, Chairman and CEO.

"Importantly, many of our businesses performed well this quarter. Our international franchise continued to expand rapidly, with revenues up 29%. Our global wealth management franchise generated record revenues and transaction services posted another record quarter on double-digit earnings growth. In securities and banking, equity markets and underwriting revenues were up a combined 33%, and our advisory revenues grew 29%. Volumes in our consumer franchise continued to grow strongly with deposits up 18%, managed loans up 13%, and we opened 96 new branches around the world," said Prince.

"As we move into the fourth quarter, we are focusing closely on improving those areas where we performed below expectation, while at the same time continuing to execute on our strategic priorities," said Prince.

## THIRD QUARTER SUMMARY

- **Revenues** were up 6%, led by 30% growth in international revenues.

    o   Global consumer revenues increased 14%, driven by international consumer up 35%, which included a $729 million pre-tax gain on the sale of Redecard shares. Excluding the gain, international consumer revenues increased 21%, reflecting deposit and loan growth of 18% and 29%, respectively, and higher investment sales, up 26%. U.S. consumer revenues were flat with the prior-year period as deposit and managed loan growth of 16% and 8%, respectively, was offset by lower securitization results in cards and the absence of gains on sale of securities in the prior-year period in consumer lending.

    o   *Markets & baning revenues declined 24%*, reflecting record transaction services revenues, up 38%, offset by a 44% decline in securities and banking. Securities and banking revenues declined due to write-downs and losses related to dislocations in the mortgage-backed securities and credit markets, including:

        ▪   *Write-downs of $1.35 billion pre-tax*, net of underwriting fees, on funded and unfunded highly leveraged finance commitments.

        ▪   *Losses of $1.56 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation* ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

        ▪   Losses of $636 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

    U.S. markets & banking revenues declined 87% and international revenues grew 7%. International revenues included strong double-digit revenue growth in Asia, Latin America, and Mexico.

    o   Global wealth management revenues increased 41%, as U.S. revenues grew 14% and international revenues more than doubled, due to double-digit organic growth and increased ownership in Nikko Cordial.

    o   Alternative investments revenues declined 63% as strong growth in client revenues was offset by lower revenues from proprietary investment activities.

- o  Excluding acquisitions and the gain on sale of Redecard shares, total organic revenues declined 3%.

- o  The net interest margin declined 3 basis points versus the second quarter 2007.

- **Operating expenses** increased 22%, driven by increased business volumes and acquisitions, which were partially offset by savings from structural expense initiatives announced in April 2007.

  - o  The company opened 96 new retail bank or consumer finance branches during the quarter, including 47 internationally and 49 in the U.S. Over the last twelve months, 820 retail bank and consumer finance branches have been opened or acquired.

  - o  Excluding the impact of acquisitions, organic expense growth was 14%.

- **Credit costs** increased $2.98 billion, primarily driven by an increase in net credit losses of $780 million and a net charge of $2.24 billion to increase loan loss reserves.

  - o  In U.S. consumer, higher credit costs reflected an increase in net credit losses of $278 million and a net charge of $1.30 billion to increase loan loss reserves. The $1.30 billion net charge compares to a net reserve release of $197 million in the prior-year period. The increase in credit costs primarily reflected a weakening of leading credit indicators, including increased delinquencies on mortgages and unsecured personal loans, as well as trends in the U.S. macro-economic environment, portfolio growth, and a change in estimate of loan losses inherent in the portfolio but not yet visible in delinquencies ("a change in estimate of loan losses").

  - o  In international consumer, higher credit costs reflected an increase in net credit losses of $460 million and a net charge of $717 million to increase loan loss reserves. The $717 million net charge compares to a net charge of $101 million in the prior-year period. The increase in credit costs primarily reflected the impact of recent acquisitions, portfolio growth, and a change in estimate of loan losses.

  - o  Markets & banking credit costs increased $98 million, primarily reflecting higher net credit losses and a $123 million net charge to increase loan loss reserves for specific counterparties. Credit costs reflected a slight weakening in portfolio credit quality.

- **Taxes.** The effective tax rate on continuing operations was 21.1% versus 27.4% in the prior-year period. The decline in the tax rate primarily reflected a higher proportion of earnings in foreign jurisdictions that have lower tax rates.

*  *  *

## MARKETS & BANKING

- **Securities and Banking**
  - o Fixed income markets revenues declined $1.64 billion to $671 million, driven primarily by:
    - Losses of $1.56 billion, net of hedges, on sub-prime mortgages warehoused for future CDO securitizations, CDO positions, and leveraged loans warehoused for future CLO securitizations.

### THE TRUTH IS REVEALED

71.     Then on November 4, 2007, Citigroup issued a press release that revealed significant

declines in the fair value of over *$55 billion* in the Company's subprime related direct exposures. In

particular, Citigroup announced that it was writing-down its subprime secured assets by *$8 billion to

$11 billion*. This write-down is in addition to the $1.4 billion write down announced on October 1,

2007. The press release stated in relevant part as follows:

> Citigroup Inc. announced today significant declines since September 30, 2007 in the fair value of the approximately *$55 billion in U.S. sub-prime related direct exposures* in its Securities and Banking (S&B) business. Citi estimates that, at the present time, the reduction in revenues attributable to these declines ranges from *approximately $8 billion to $11 billion* (representing a decline of approximately $5 billion to $7 billion in net income on an after-tax basis).

> These declines in the fair value of Citi's sub-prime related direct exposures followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter. The impact on Citi's financial results for the fourth quarter from changes in the fair value of these exposures will depend on future market developments and could differ materially from the range above.

> Citi also announced that, while significant uncertainty continues to prevail in financial markets, it expects, taking into account maintaining its current dividend level, that its capital ratios will return within the range of targeted levels by the end of the second quarter of 2008. Accordingly, Citi has no plans to reduce its current dividend level.

> The $55 billion in U.S. sub-prime direct exposure in S&B as of September 30, 2007 consisted of (a) approximately $11.7 billion of sub-prime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs).

> **Lending and Structuring Exposures**

> Citi's approximately $11.7 billion of sub-prime related exposures in the lending and structuring business as of September 30, 2007 compares to approximately $13 billion of sub-prime related exposures in the lending and

structuring business at the end of the second quarter and approximately $24 billion at the beginning of the year. The $11.7 billion of sub-prime related exposures includes approximately $2.7 billion of CDO warehouse inventory and unsold tranches of ABS CDOs, approximately $4.2 billion of actively managed sub-prime loans purchased for resale or securitization at a discount to par primarily in the last six months, and approximately $4.8 billion of financing transactions with customers secured by sub-prime collateral. These amounts represent fair value determined based on observable transactions and other market data. Following the downgrades and market developments referred to above, the fair value of the CDO warehouse inventory and unsold tranches of ABS CDOs has declined significantly, while the declines in the fair value of the other sub-prime related exposures in the lending and structuring business have not been significant.

**ABS CDO Super Senior Exposures**

Citi's $43 billion in ABS CDO super senior exposures as of September 30, 2007 is backed primarily by sub-prime RMBS collateral. These exposures include approximately $25 billion in commercial paper principally secured by super senior tranches of high grade ABS CDOs and approximately $18 billion of super senior tranches of ABS CDOs, consisting of approximately $10 billion of high grade ABS CDOs, approximately $8 billion of mezzanine ABS CDOs and approximately $0.2 billion of ABS CDO-squared transactions.

Although the principal collateral underlying these super senior tranches is U.S. sub-prime RMBS, as noted above, these exposures represent the most senior tranches of the capital structure of the ABS CDOs. These super senior tranches are not subject to valuation based on observable market transactions. Accordingly, fair value of these super senior exposures is based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value. The rating agency downgrades and market developments referred to above have led to changes in the appropriate discount rates applicable to these super senior tranches, which have resulted in significant declines in the estimates of the fair value of S&B super senior exposures.

**Other Information**

The fair value of S&B sub-prime related exposures depends on market conditions and assumptions that are subject to change over time. In addition, if sales of super senior tranches of ABS CDOs occur in the future, these sales might represent observable market transactions that could then be used to determine fair value of the S&B super senior exposures described above. As a result, the fair value of these exposures at the end of the fourth quarter will depend on future market developments.

Citi has provided specific targets for its two primary capital ratios: the Tier 1 capital ratio and the ratio of tangible common equity to risk-weighted managed assets (TCE/RWMA ratio). Those targets are 7.5% for Tier 1 and 6.5% for TCE/RWMA. At September 30, 2007, Citi had a Tier 1 ratio of 7.3% and a TCE/RWMA ratio of 5.9%.

72.    On that same day, Citigroup filed its Form 10-Q for its third fiscal quarter 2007. The filing revealed that Citigroup was revising the financial results issued by the Company on October 15, 2007. Specifically, Citigroup downward revised its net income by $166 million.

73.    Defendant Prince tendered his resignation on the weekend preceding these disastrous disclosures.

## REASONS THE STATEMENTS WERE IMPROPER

74.    Citigroup's Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)    Citigroup was more exposed to the subprime market crisis than it had disclosed;

(b)    Citigroup's purchases of billions of subprime loans during the Relevant Period from lenders such as Accredited were reckless and would eventually lead to billions in write-downs and lost revenues; and

(c)    As a result of the foregoing, Citigroup's reported earnings for its third fiscal quarter 2007 were inaccurate.

## THE IMPROPER BUYBACK

75.    During the Relevant Period, while Citigroup's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $663 million worth of its own shares at an average price of approximately $53 per share, which is substantially higher than Citigroup's current share price of less than $36 per share and approximate to the $53 per share the defendants averaged in selling their own Citigroup stock holdings during the Relevant Period.  On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the subprime mortgage lending crisis and its affect on the Company's billions in warehoused subprime loans.  While Citigroup was repurchasing these shares, the Insider Selling Defendants made the sales described below.

## DAMAGES TO CITIGROUP CAUSED BY THE INDIVIDUAL DEFENDANTS

76.    As a result of the Individual Defendants' improprieties, Citigroup disseminated improper statements concerning its business prospects as alleged above.  These improper statements

have devastated Citigroup's credibility as reflected by the Company's $83.3 billion market capitalization loss.

77.     Further, as a direct and proximate result of the Individual Defendants' action, Citigroup has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Citigroup; and

(b)     Costs incurred from the $663 million that Citigroup spent repurchasing its own stock; and

(c)     Costs incurred from the billions in subprime loans recklessly purchased during the Relevant Period.

78.     Moreover, these actions have irreparably damaged Citigroup's corporate image and goodwill. For at least the foreseeable future, Citigroup will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Citigroup's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

79.     The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth. Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Citigroup's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BISCHOFF | 1/22/2007 | 17,708 | $54.55 | $965,971.40 |
|  | 2/23/2007 | 15,419 | $53.64 | $827,075.16 |
|  |  | 33,127 |  | $1,793,046.56 |
|  |  |  |  |  |
| BUSHNELL | 1/22/2007 | 25,528 | $54.55 | $1,392,552.40 |
|  | 2/27/2007 | 6,940 | $52.10 | $361,574.00 |

| | | | | |
|---|---|---|---|---|
| | 2/27/2007 | 5,070 | $52.68 | $267,087.60 |
| | 2/27/2007 | 1,514 | $52.68 | $79,757.52 |
| | 7/23/2007 | 7,120 | $50.73 | $361,197.60 |
| | 7/23/2007 | 3,656 | $50.73 | $185,468.88 |
| | 7/23/2007 | 675 | $50.73 | $34,242.75 |
| | 7/23/2007 | 358 | $50.73 | $18,161.34 |
| | | **50,861** | | **$2,700,042.09** |
| | | | | |
| **DRUSKIN** | 1/22/2007 | 43,639 | $54.55 | $2,380,507.45 |
| | 1/29/2007 | 20,000 | $54.02 | $1,080,400.00 |
| | 4/18/2007 | 10,000 | $53.07 | $530,700.00 |
| | 7/13/2007 | 21,362 | $52.84 | $1,128,768.08 |
| | 7/13/2007 | 2,523 | $52.84 | $133,315.32 |
| | | **97,524** | | **$5,253,690.85** |
| | | | | |
| **FREIBERG** | 1/22/2007 | 21,162 | $54.55 | $1,154,387.10 |
| | 7/20/2007 | 10,596 | $51.13 | $541,773.48 |
| | 7/20/2007 | 995 | $51.13 | $50,874.35 |
| | | **32,753** | | **$1,747,034.93** |
| | | | | |
| **GERSPACH** | 1/22/2007 | 4,574 | $54.55 | $249,511.70 |
| | 4/17/2007 | 12,012 | $52.93 | $635,795.16 |
| | 4/17/2007 | 7,116 | $52.93 | $376,649.88 |
| | | **23,702** | | **$1,261,956.74** |
| | | | | |
| **HELFER** | 1/22/2007 | 19,590 | $54.55 | $1,068,634.50 |
| | | **19,590** | | **$1,068,634.50** |
| | | | | |
| **KADEN** | 1/22/2007 | 11,200 | $54.55 | $610,960.00 |
| | | **11,200** | | **$610,960.00** |
| | | | | |
| **KLEIN** | 7/17/2007 | 17,302 | $52.19 | $902,991.38 |
| | 7/17/2007 | 1,980 | $52.19 | $103,336.20 |
| | | **19,282** | | **$1,006,327.58** |
| | | | | |
| **KRAWCHECK** | 1/22/2007 | 50,339 | $54.55 | $2,745,992.45 |
| | | **50,339** | | **$2,745,992.45** |
| | | | | |
| **MAHERAS** | 7/13/2007 | 21,362 | $52.84 | $1,128,768.08 |
| | 7/13/2007 | 2,602 | $52.84 | $137,489.68 |
| | | **23,964** | | **$1,266,257.76** |
| | | | | |
| **PRINCE** | 1/22/2007 | 81,087 | $54.55 | $4,423,295.85 |
| | 4/17/2007 | 12,229 | $52.93 | $647,280.97 |
| | 4/17/2007 | 1,190 | $52.93 | $62,986.70 |
| | 5/17/2007 | 12,221 | $54.91 | $671,055.11 |
| | 5/17/2007 | 1,174 | $54.91 | $64,464.34 |
| | 7/13/2007 | 34,179 | $52.84 | $1,806,018.36 |

| | | 7/13/2007 | 4,163 | $52.84 | $219,972.92 |
|---|---|---|---|---|---|
| | | | 146,243 | | $7,895,074.25 |
| | | | | | |
| RHODES | | 1/22/2007 | 24,686 | $54.55 | $1,346,621.30 |
| | | 2/5/2007 | 8,000 | $55.03 | $440,240.00 |
| | | 7/13/2007 | 42,723 | $52.84 | $2,257,483.32 |
| | | 7/13/2007 | 5,205 | $52.84 | $275,032.20 |
| | | | 80,614 | | $4,319,376.82 |
| | | | | | |
| RUBIN | | 1/22/2007 | 77,500 | $55.05 | $4,266,375.00 |
| | | | 77,500 | | $4,266,375.00 |
| | | | | | |
| VOLK | | 1/22/2007 | 16,347 | $54.55 | $891,728.85 |
| | | | 16,347 | | $891,728.85 |
| | | | | | |
| TOTAL | | | 683,046 | | $36,826,498.38 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.     Plaintiff brings this action derivatively in the right and for the benefit of Citigroup to redress injuries suffered, and to be suffered, by Citigroup as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by Individual Defendants. Citigroup is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

81.     Plaintiff will adequately and fairly represent the interests of Citigroup in enforcing and prosecuting its rights.

82.     Plaintiff is and was an owner of the stock of Citigroup during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

83.     The current Board of Citigroup consists of the following thirteen individuals: defendants Rubin, Parsons, Thomas, Derr, Armstrong, Deutch, Belda, Ramirez, David, Mulcahy, Rodin, Liveris and Ryan.

84.     Defendants Rubin, Parsons, Thomas, Derr, Armstrong, Deutch, Belda, Ramirez, David, Mulcahy, Rodin, Liveris and Ryan as members of the Board during the Relevant Period authorized the buyback of over $663 million worth of the Company's shares at artificially inflated

prices. The Board's decision to authorize the share buyback was not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider the negative effects that the subprime mortgage crisis would have on the Company's business prospects. Further, defendant Rubin, engaged in self-dealing in that he sold his personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

85.    As a result of his access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors, and attendance at management and Board meetings, defendant Rubin knew the adverse non-public information regarding Citigroup's true business prospects. While in possession of this material adverse non-public information regarding the Company, defendant Rubin sold 77,500 shares of Citigroup stock for proceeds of $4,266,375. Because defendant Rubin received a personal financial benefit from the challenged insider trading transactions, he is interested. Moreover, defendant Rubin faces a sufficiently substantial threat of liability for his breach of fiduciary duties for insider selling. Since defendant Rubin breached his fiduciary duties and is interested, any demand upon him is futile.

86.    Defendants Armstrong, David, Deutch, Liveris, Mulcahy, Rodin and Ryan were, during the Relevant Period, members of the Audit and Risk Management Committee. The Audit and Risk Management Committee's charter provides that that the committee is responsible for reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies. Thus, the Audit and Risk Management Committee was responsible for overseeing and directly participating in the dissemination of Citigroup's earnings press releases. Accordingly, defendants Armstrong, David, Deutch, Liveris, Mulcahy, Rodin and Ryan breached their fiduciary duties of due care, loyalty, and good faith because the Audit and Risk Management Committee participated in the preparation of improper statements and earnings press releases that contained improper material information. Particularly, these defendants reviewed and failed to correct Citigroup's improper earnings press releases described above. Thus, Armstrong, David, Deutch, Liveris, Mulcahy, Rodin and Ryan face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

87.    The principal professional occupation of Rubin is his employment with Citigroup, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Specifically, Citigroup paid Rubin the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $1,000,000 | $8,400,000 | $6,766,666 | $828,342 | - | $20,916 | $325,380 |
| 2005 | $1,000,000 | $8,400,000 | $6,766,666 | - | 161,389 | - | $330,392 |
| 2004 | $1,000,000 | $8,400,000 | $6,766,667 | - | - | - | $461,439 |
| 2003 | $1,000,000 | $10,250,000 | $5,000,000 | - | 100,000 | - | $306,813 |

Accordingly, Rubin lacks independence from defendants Belda, Derr and Parsons, who are not disinterested and/or independent and who exert influence over Rubin's compensation by virtue of their positions as members of the Personnel and Compensation Committee.  The Personnel and Compensation Committee has the authority to review and approve Rubin's base salary, bonus and equity compensation.  This lack of independence rendered defendant Rubin incapable of impartially considering a demand to commence and vigorously prosecute this action.

88.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

89.    The Director Defendants of Citigroup, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Citigroup's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

90.    The acts complained of constitute violations of the Exchange Act and violations of fiduciary duties owed by Citigroup's officers and directors and these acts are incapable of ratification.

91.    Each of the Director Defendants of Citigroup authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various

improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

92.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for Citigroup for any of the wrongdoing alleged by plaintiff herein.

93.     Plaintiff has not made any demand on shareholders of Citigroup to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Citigroup is a publicly held company with over 4.9 billion shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Derivatively Against All Defendants for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     During the Relevant Period, the Individual Defendants disseminated or approved public statements that improperly portrayed Citigroup's business prospects, growth and margins. The Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing and should have known that the Company's public statements concerning its business prospects were misleading.

96.     The Insider Selling Defendants also sold over $36 million worth of shares of Citigroup's common stock at inflated prices during the Relevant Period while in possession of material non-public information.    These defendants misappropriated Citigroup's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Citigroup stock without disclosing the information alleged to have been concealed

herein.

97.    At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Citigroup's business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing Citigroup to repurchase over $663 million worth of its own stock on the open market at an average inflated price of approximately $53 per share, which is substantially higher than Citigroup's current share price of under $36 per share.

98.    As such, the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

       (a)    Employed devices, schemes and artifices to defraud;

       (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

       (c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Citigroup and others in connection with their purchases of Citigroup common stock during the Relevant Period.

99.    As a result of the Individual Defendants' misconduct, Citigroup has and will suffer damages in that it paid artificially inflated prices for Citigroup common stock purchased on the open market. Citigroup would not have purchased Citigroup common stock at the prices it paid, had the market previously been aware that the market price of Citigroup's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Citigroup suffered damages in connection with its purchases of Citigroup common stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty for Improper Financial Reporting

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    The Individual Defendants owed and owe Citigroup fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Citigroup the highest obligation of good faith, fair dealing, loyalty and due care.

102.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

103.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and financial results. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

104.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Citigroup has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

105.    Plaintiff, on behalf of Citigroup, has no adequate remedy at law.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Citigroup common stock on the basis of such information.

108.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Citigroup common stock.

109.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Citigroup common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

110.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### COUNT IV

### Against All Defendants for Waste of Corporate Assets

111.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.   As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $663 million to repurchase the Company' stock, paying bonuses to certain of its executive officers and incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

113.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

114.   Plaintiff, on behalf of Citigroup, has no adequate remedy at law.

### COUNT V

### Against All Defendants for Unjust Enrichment

115.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Citigroup.

117.   Plaintiff, as a shareholder and representative of Citigroup, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and

other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.      Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Citigroup damages;

C.      Directing Citigroup to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Citigroup and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Citigroup to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the accuracy of the qualifications of Citigroup's directors, executives and other employees;

4.      a proposal to control insider selling;

5.      a proposal to ensure that Citigroup prudently expends funds in stock repurchase programs; and

6.      appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Citigroup has an effective remedy;

E.    Awarding to Citigroup restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 14, 2007          LAW OFFICES OF THOMAS G. AMON

_____
THOMAS G. AMON (TGA – 1515)

500 Fifth Avenue, Suite 1650
New York, N.Y. 10110
Telephone: (212) 810-2430
Facsimile:  (212) 810-2427

LANDSKRONER GRIECO MADDEN, LTD
JACK LANDSKRONER
1360 West 9th, Suite 200
Cleveland, OH 44113
Telephone: (216) 522-9000
Facsimile: (216) 522-9007

Attorneys for Plaintiff

## **VERIFICATION**

I. JACK LANDSKRONER. hereby declare as follows:

1.    I am a member of the law firm of Landskroner · Grieco · Madden. Ltd.. one of the counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.    I make this Verification because plaintiff is absent from the County of Cuyahoga where I maintain my office.

Executed this 12th day of November. 2007. at Cleveland, Ohio.

_____
JACK LANDSKRONER